**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DR. TRACY WRIGHT<br>4925 Brown Station Rd.<br>Upper Marlboro, MD 20772<br>United States<br><br>And<br><br>DR. MARLA DEAN<br>3240 O Street SE<br>Washington, DC 20020,<br><br>Plaintiffs,<br><br>     v.<br><br>CHAVEZ SCHOOLS<br>525 School Street SW<br>5th Floor<br>Washington D.C., 20024<br><br>And<br><br>TENSQUARE, LLC<br>1101 17th Street NW Suite 200<br>Washington D.C. 20036,<br><br>And<br><br>JOAN MASSEY<br>1 E 104th St,<br>New York, NY 10029<br><br>And<br><br>KATIE HERMAN,<br>1101 17th Street NW Suite 200<br>Washington D.C. 20036,<br><br>     Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*   Case No.: _____<br>*<br>*   JURY TRIAL DEMANDED<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* |

## <u>EMPLOYMENT DISCRIMINATION COMPLAINT</u>

### I.   JURISDICTION

1.    Plaintiff Dr. Tracy Wright is an African-American female resident of Maryland.

2.    Plaintiff Dr. Marla Dean is an African-American female resident of the District of Columbia.

3.    At all times relevant to this action, they either sought to be employed or were employed by Chavez Schools ("Chavez").

4.    Chavez operates four charter schools in the District of Columbia and others in New Orleans.

5.    Joan Massey was the CEO of Chavez, who inflicted racially and retaliatorily hostile work environments against Dr. Wright and Dr. Dean.

6.    The employment at Chavez was entirely within the District of Columbia at all times.

7.    TenSquare is a national charter school company based in the District of Columbia, that operates four charter schools here.

8.    TenSquare is engaged in the acquisition, financing and development of academic facilities.

9.    TenSquare assumed management of Chavez Schools in October 2016.

10.    As of October 2016, TenSquare was a joint employer of Dr. Wright and Dr. Dean, together with Chavez.

11.    Defendant Herman is a partner in TenSquare and was instrumental in the 2016 non-promotion of Dr. Wright and the terminations of Dr. Wright and Dr. Dean.

12.    This Court has subject matter jurisdiction over all claims under District of Columbia and Federal law referenced herein.

13.     This Court is the proper venue for these claims.

## II.     EXHAUSTION OF REMEDIES & TOLLING

14.     Private sector employees such as Wright and Dean need not exhaust any particular administrative remedies under either 42 U.S.C. § 1981 or the District of Columbia Human Rights Act ("DCHRA") (D.C. Code § 1-2502 et seq).

15.     Nonetheless, Dean filed a charge with the Equal Employment Opportunity Commission, on or about June 23, 2016.

16.     Upon information and belief, this charge was cross filed with the D.C. Office of Human Rights.

17.     That charge remains pending as of the time of this filing; by law its pendency tolled the DCHRA statute of limitations.

18.     Dean is not bringing any Title VII claim here.

19.     Dean has therefore completed any exhaustion of administrative remedies that might possibly be required under the D.C. Human Rights Act.

20.     Wright has filed no discrimination charges with any Human Rights agency pertaining to any of the matters at issue in this case.

21.     Accordingly, both plaintiffs' suits are ripe for judicial adjudication, without need of any further administrative exhaustion pursuant to Title VII or the DCHRA.

## III.     FACTS

### Background on Dr. Tracy Wright

22.     Chavez hired Dr. Tracy Wright in October 2009 as a leadership coach, then promoted her in January 2010 to the position of Chief Academic Officer.

23.     When Wright first entered on duty, the organization was constrained by a duty to resolve 57 conditions, in order to avoid initiation of charter revocation proceedings.

24.     Through her leadership, and hers and others' hard work, the organization passed that test, and three of its four schools subsequently received accolades on performance from both state and local authorities, and all four Chavez schools received awards for the positive shifts made in the schools' cultures and climates.

25.     Wright subsequently performed the duties of Chief Academic Officer for five years, and added the CEO duties— on an informal basis during the first CEO leadership transition in the summer of 2014— before white selectee Joan Massey was brought in as Chief Executive Officer in November 2014.

26.     Despite outstanding performance on the company's behalf, when a new CEO was selected in 2014, Wright was passed over even while she was performing as the de facto Interim CEO for approximately four months.

27.     Wright was easily better-qualified for the position than white selectee Joan Massey.

**Background on Dr. Marla Dean**

28.     Marla Dean was also hired by Chavez in spring 2015 as an Executive Director of Schools.

29.     Dr. Dean came to the organization with more than 25 years in education and as a successful secondary school principal who had recently pulled her school out of turnaround status.

30.     As a turnaround principal, Dean received an award and special recognition from the Prince George's County School Board for her commitment to the school's community, the development of school partnership and the multitude of innovative programming Dean brought to her school.

31.     Chavez demoted Dean in June 2016, to Senior Director of School Accountability, because of her race and protected activity directed against Chavez.

**The Race-Discriminatory 2014 Non-Selection of Dr. Wright**

32.     By 2014, Dr. Wright had been with the company for five years, and had performed in an exemplary manner.

33.     When the Board was seeking a new CEO at that time, it informally promoted Dr. Wright temporarily to perform as the de facto interim CEO.

34.     Wright informed the outgoing CEO and Founder, Ms. Salcido, of her interest in assuming the role of CEO.

35.     When Wright was presented by the Founder as a viable candidate, the Board rejected her candidacy without interview or additional inquiry.

36.     Further, the Board suppressed her candidacy by conducting a "closed" application and interview process that precluded her both from applying formally, and even from participating on the management side in any aspect of the interview process.

37.     Instead of Wright, the Chavez Board of Directors selected Joan Massey, a white woman of inferior accomplishment and educational credentials from outside the organization.

38.     Dr. Wright should have obtained that selection, but was denied on account of her race.

**Massey Creates an Overall Poisonous Work Environment**

39.     Once in place, former CEO Massey demonstrated a modus operandi of treating women of color in a style that was harsh and abusive, in contrast to her more favorable treatment of white and male employees.

40.     Offensively, Massey repeatedly expressed her view that, during working time, she "owned" her minority employees.

41. On one occasion, multiple employees heard her say to a group of black subordinates: "[f]or the hours you are supposed to be here I "own" you. ...your time belongs to me."

42. Massey openly admitted her preference for white subordinates.

43. For instance, she referred to Stephanie Remick, Eric Jones and Rob Murphy, all of whom are white, as her "favorites".

44. After Dr. Wright cautioned her that she should not be saying this, Massey doubled down, publicly uttering that: "Tracy tells me I can't say this, but they are my favorites" (in reference to Jones and Remick).

45. Massey never made mention of, nor acted as if she had any black favorites.

46. Massey's preference was further exemplified in the manner in which she characterized and described white employees.

47. For example, Massey consistently described most white employees as "smart".

48. Vera Krimnus, a white woman, was labeled by Massey, publicly, as the smartest person in the organization.

49. The title "smart", was never used by her when describing the work, aptitude and accomplishments of black staff, despite their exemplary quality of work and/or educational levels (MBA, Doctorates, Law Degrees).

50. Far from respecting them, Massey demanded that black subordinates lend her their shoes, give her private rides as if they were her chauffeurs, fetch her coffee from Starbucks, retrieve items from the supply closet, pick up her dry cleaning, make copies or scan personal documents, post her personal mail, and perform other menial tasks consistent with being "owned".

51.     Massey's psychology in treating blacks in this way, was revealed in part when she would regularly make comments dismissive of the value of Historically Black Colleges and Universities ("HBCU's"), which, as she knows, Wright and fellow employee Desiree Brown attended.

52.     Massey stated that she doesn't believe in the premise of an HBCU, and denigrates the caliber of education received by their students.

53.     Massey has publicly contrasted HBCU's unfavorably with "competitive" educational institutions, and indicated that she believes that HBCUs cater to individuals who are less intelligent than students who attend other institutions, and leaves them less prepared to assume the challenges of the work environment.

54.     Massey stated to Brown that individuals who attend an HBCU are unable to get into any other university or college.

55.     Massey stated that she is opposed to Chavez scholars applying to them.

56.     Further, Brown, who had pennants and posters from Howard University on her wall and around her office, reminded Massey that she attended Howard.

57.     Brown also reminded Massey that Wright had also attended an HBCU, as had others in the office.

58.     Massey did not care; she reiterated that HBCU's would not be an option for Chavez students.

59.     Further elaborating on her own racial bias, Massey has also denigrated non-whites who attend elite private colleges and universities, expressing the view that they only attend those schools as beneficiaries of affirmative action.

60.     Thus, on numerous occasions, Massey uttered dismissive comments about Ms. Irasema Salcido, Chavez' founder, specifically stating publicly that she believes that Ms. Salcido

only achieved her successes because of opportunities handed to her because she is a Mexican woman.

61.     Thus, in concert with her hostile statements about HBCU's, Massey professed the opinion that minorities who succeed are always suspect— either their credentials are not really sufficient, or they must have received those credentials based on an unfair advantage.

62.     This is disparaging to all non-whites, and was especially insulting to Ms. Brown and Dr. Wright both attended Howard University— an HBCU— and Dr. Wright and Dr. Dean, as both have degrees from highly selective, majority white, "elite" universities.

63.     Massey routinely stressed the importance of Chavez's public policy education and the efforts made to ensure that students understand and participated in a just, free and equal project, including in discussion with external stakeholders.

64.     Yet, when Brown had signage and other postings on the Black Lives Matter (BLM) movement on her office white board, Massey demanded that all reference to BLM be removed from the office and that Brown refrain from discussing BLM with scholars.

65.     Additionally, when Brown and Dean proposed that scholars become actively involved in the toxic water matter crisis in Flint Michigan, Massey did not want the students involved, asserting that the reason was that the issue impacted predominantly the African American community-- one segment of the population.

66.     This was particularly concerning since Dean is a native Michigander who understood that while Flint is predominately African-American, it is not exclusively so.

67.     Massey also made several comments which highlighted her weird and inappropriate obsession with black women, in addition to her lack of sensitivity and cultural incompetence in engaging with women of color.

68.     For instance, on numerous occasions, in front of other staff, Massey placed her arm next to Wright's and remarked that she had darker skin than Wright.

69.     On other occasions, she has pointed to her freshly tanned skin in front of other African American subordinates and, comparing the hue of her skin to the women of color who surrounded her, said: "I am almost there."

70.     Massey also wanted to touch black subordinates' hair, and insisted on doing so. Indeed, she would regularly invade their personal space.

71.     Moreover, Massey was apathetic in ensuring that others did not infringe upon individuals' personal space.

72.     For example, when Brown lodged a complaint regarding Vera Krimnus, a white woman, touching her hair with Ms. Keisha Jackson, Executive Director of Human Resources, Massey responded by stating that Brown was overreacting and refused to address the matter.

73.     Brown and Dean became aware of this incident.

74.     Massey's racial bias was also evident in her other communications.

75.     Thus, on several occasions, instead of addressing them directly herself, Massey directed Wright to follow up with black women employees when they disagreed with her, or if Massey did not like their tone, or the content of what they said.

76.     Specifically, she would direct Dr. Wright to ". . . tell them they are not to talk to me like that" or ". . . before we meet you need to tell her to keep her mouth shut and just listen."

77.     Massey never made similar requests pertaining to white or male employees, many of whom openly interrupted and disagreed.

78.     In December 2016 (12/16/15), Massey also expressed the discriminatory view that gatherings that appealed to black Chavez employees were reflective of cliques and exclusivity.

79.     For instance, Massey called Dr. Wright while Wright was on leave, to assert that "Taco Tuesday" events (a monthly potluck gathering), which were open to everyone in the home office, carried racial overtones (because those who participated were predominantly black) and were to be discontinued.

80.     Wright responded that there were many different groups of staff who convened for lunch and could do so without expressed concern from the CEO, and that the directive for this small group of colleagues to cease having lunch once a month reflected "dangerous grounds" with "strong racial overtones".

81.     Wright also proposed that given the damaged morale of the organization's staff, the events fostered camaraderie and were good for the spirit.

82.     Massey retorted, "No, it is exclusionary and cliquish and I don't play those kinds of games."

83.     Wright pleaded to Massey to be allowed to talk to the participants to ensure that they were not left feeling targeted, however, Massey refused and ordered "Taco Tuesdays" to cease immediately.

84.     Similarly, when Brown was one of the founders of an after-school program to encourage girls to strive toward high academic achievement and to develop life skills, Massey demanded her involvement in the program cease immediately, claiming the program should not be run out of the home office.

85.     Wright pleaded with Massey, raising the fact that it was not appropriate to prohibit these black women from running an after-school program for which they were unpaid, when white staff were being allowed to run after-school programs, and emphasizing that members of the Chavez Home Office Staff had always engaged with students and schools in this manner.

86. Wright told Massey that Massey's approach was "heartbreaking" and "devastating", to both the female students who asked for this programming and the staff who answered their plea.

87. Massey, however, motivated by racial animus, would not be moved.

88. Massey's extreme suspicion of her black subordinates was reflected in other ways as well.

89. Massey insisted that Brown was not to close her office door to converse with Dean, nor could any staff gather in her office space for meetings or work- related private discussions.

90. After receiving the order to refrain from having closed-door conversations, Brown resorted to placing signage on the door that reflected that she was in a meeting or on a call.

91. This was to attempt to maintain the confidentiality of the individuals that Brown was meeting with. Still, Massey would enter the space when the signage was visible without care or concern for the confidential nature of those discussions.

92. Further, she directed Wright, on no less than four occasions, to demand that Brown and Dean not conduct meetings with the door closed.

93. Wright reminded Massey that others in the organization, specifically white staff, were permitted to hold closed door meetings and that Massey's "targeting of these two Black women" had "glaring racial overtones."

94. Massey insisted on pressing the directive despite these cautions.

-11-

**<u>Dr. Wright is Subjected to a Racial and Retaliatory Hostile Work Environment;</u>**
**<u>Abusive Treatment of Dr. Wright; Dr. Wright Suffers a Panic Attack</u>**

95.     Massey conducted a campaign of harassment against Dr. Wright.

96.     For instance, she implied falsely that Wright is lazy, saying "I've heard you say you're tired. . .You have said you are overwhelmed[,]" when in fact Wright never said either.

97.     On several occasions Massey--in front of others-- told Wright to "just leave[,]" shooing her from her presence, thus giving the impression that Wright was not a senior member of the executive team of the organization.

98.     This occurred, for instance, in the presence of the Chief Financial Officer and the Chief Operating Officer, when Massey also shoved Wright's computer and the charger toward her physically.

99.     She would say with an insulting manner: "Tracy – you need to think before you come talk to me," thus undermining Wright in front of others.

100.     One such diatribe in a budget meeting became so ridiculously offensive that Wright excused herself to go to the restroom.

101.     As she left the room, she fainted and lost control of her bladder.

102.     Thus, in late March/April 2016, on the Friday before spring break, Dr. Wright was rushed by ambulance to the hospital.

103.     Given that her blood pressure had risen to an abnormally elevated level, she was placed on medical leave of absence.

104.     This was the second time within a six-month period that Dr. Wright had to receive medical care for stress induced by Massey's treatment.

105.     Wright had no history of stress-related health problems prior to Wright working under Massey.

**Massey Mistreats Dr. Dean, subjecting her to a Racially Hostile Work Environment to Which the White Male Comparator is not; Dr. Dean Suffers a Stroke**

106.    Massey targeted Dr. Dean for special abuse.

107.    Thus, she would routinely berate Dean in public with comments such as ". . . if I did things like you, I would lose my job" or ". . . if I were superintendent of schools, and 3 of my 4 principles were not performing, I would lose my job."

108.    These comments were made both in public staff meetings, and in meetings with representatives of up to 15 other organizations.

109.    CEO Massey did not publicly criticize or humiliate Rob Murphy, Director of Teaching and Learning -- a Caucasian man.

110.    Murphy performed in a role similar to Dr. Dean's.

111.    Massey focused her attacks on Dr. Dean with harsh comments about student outcomes and performance metrics, but again, without any formal performance appraisal or improvement process.

112.    Dean, in fact, was not responsible for the work directly impacting student performance and outcomes, nor did her job description charge her with the oversight of the activities directly connected to these.

113.    Murphy's position focused squarely on the performance of students, but even as student performance drastically declined, was never the target of Massey's berating or public demeaning.

114.    Massey's public attacks were reserved for the purpose of abusing and humiliating women of color, specifically including Dean.

115.    As noted, however, notwithstanding these public criticisms, Massey made no public or private assertions, neither verbally or written, as to how she wanted Dean to perform differently.

116.    Dr. Dean announced, during an Executive Team training session, that she would take be taking two days of leave in April 2016.

117.    At this time, Dean had not taken any vacation leave in the year she had worked at Chavez Schools.

118.    Massey argued with Dean in an agitated, irritated, upset disdain, about Dean's need to be off work to attend a wedding.

119.    Dean then needed medical leave in May after an April 29 stroke that she suffered during a cabinet meeting with Massey as Massey berated her for asking a question regarding the hiring process of the school coordinator position at Chavez Prep.

**Massey Disparately Favors Whites**

120.    Massey routinely discriminated against black subordinates.

121.    For instance, she told black employees that she "owned" them during their work hours, but did not make similar comments to whites.

122.    She denigrated their intelligence and education, but not that of whites. She would accuse blacks of being cliquish and self-important, but never spoke similarly of white employees.

123.    For instance, Massey said to Tameria Lewis (who is white): "some people think they are important—but they are not as important as they think they are. . . " (this comment was made in reference to Dr. Wright).

124.    Massey tolerated errors and deficient performance of male and white employees, without ever attacking them in the manner she inflicted upon blacks, particularly women of color.

125.    For instance, the male Executive Director of Information Technology "lost" over 100 computers due to poor inventorying practices, causing a $30,000.00+ pecuniary loss.

126.    He was neither harassed, berated nor even held accountable for such an oversight.

127.    In fact, the male Executive Director of Information Technology was promoted to COO, despite Dr. Wright's pleas to Massey to wait until he demonstrated improved performance relative to detailed management.

128.    In being promoted, the non-protesting Executive Director of Information Technology, Keon Toyer, who had been in his position for less than six weeks, and with the organization for less than a year, assumed significant duties to which Wright had previously been assigned.

129.    Massey subjected numerous women of color to a cycle of harassment that led to duties-stripping, demotion and/or the women's employment ending.

130.    There were two black women and one Mexican woman who were terminated/forced to resign by Massey prior to Wright and Dean, including the founder, Irasema Salcido.

131.    Three women of color resigned prior to the removals of Wright and Dean.

132.    Five remaining women of color were being targeted for mistreatment by Massey, at least until Massey left.

133.    Massey had a particular problem with black women using their earned sick or vacation leave.

134.    As is being discussed in further detail elsewhere, she expressed her frustration with both Brown and Dean for using leave and demoted them, while breezily excusing white employees' leave usage.

**Wright Expresses Protected Statements, Extensively**

135.    On April 29, 2016, Dr. Dean suffered a stroke. Wright informed Massey on May 2, as soon as Wright learned of it.

136.    Wright told Massey that Dean's vision was permanently impaired, that Dean could not drive and that she was restricted in physical movement due to the visual impairment.

137.    Wright, having been rushed to the hospital a month earlier, stated that "...stress was taking people down".

138.    Massey replied "...be careful about saying it's stress related."

139.    Wright told Massey that the toxicity of the work environment caused the stroke.

140.    Massey, shirking responsibility as usual, retorted: "[y]ou can't say definitively, you're not a medical doctor."

141.    Massey added that: "[m]aking blanket statements about stress being the cause will be concerning to people".

142.    Massey added that she was "guessing Dr. Dean will not be back this year."

**Wright, Dean and Desiree Brown Protest the Discriminatory Treatment; Retaliation is Effected by Demotion of Dean and Physical Reassignment of Brown**

143.    On June 1, 2016, Desiree Brown protested Massey's discriminatory practices to attorney Keisha Jackson, the Executive Director of Human Resources

144.    That day, because there was no process in place for the Board to handle discrimination complaints, Ms. Jackson forwarded complaints she received, including from Ms. Brown and Dr. Dean, to Dr. Wright.

145.    Upon receiving the complaints, Wright engaged the Board Chair, Kathy Bihr. Wright and Bihr agreed that they would meet on June 2.

146.    During the June 2 meeting at the JW Marriott Hotel, Dr. Wright told Ms. Bihr that Massey was "discriminating against " Brown and Dean.

147.    Wright told Bihr about Massey's demand that Murphy use his "gay-dar" as well.

148.    Bihr appeared upset as she listened.

149.    Wright further shared the employees' complaints and Massey's 360 evaluations along with significant data to support the contention that a troubling climate existed under Massey's rule.

150.    Bihr said that she would be in touch with Wright to give guidance on next steps. Bihr subsequently contacted Wright several times and ultimately directed Wright to connect with the individuals who had written evaluations of Massey, saying that the Board would investigate the formal complaints.

151.    On June 6, 2016, graduation day, just four days after Wright's protest to Bihr on Brown's and Dean's behalf, Massey set up a lunch between herself and Wright.

152.    At the lunch, Massey informed Wright that Massey wanted to fire Dean. Massey said Dean was trying to "run her own agenda." Massey added: "I don't think she is a good fit for the organization."

153.    Wright reminded Massey that Massey had, herself, personally selected Dean to join the team, convincing Dean to leave an esteemed position mid-year, and that this move to terminate Dean was not rooted in any factual data.

154.    Wright warned that these "baseless" actions would make it difficult for the organization to recruit and retain high quality staff, and that given Massey's propensity to

move against employees without just or defined cause, Wright had deep trepidation about making recommendations for potential new employees to join the organization.

155.    Massey responded, "[f]ine, I'll leave it to you and won't say anything else about Marla [Dean]."

156.    Also on June 6, as Massey and Wright returned from lunch, they encountered Dean walking from a different location and Massey again tried to get Dean (who was wearing a heart monitor as she had recently return from having a stroke) to fetch her coffee from Starbucks because she, "...felt like having something sweet.".

157.    Also, as contracts for the 2016/2017 year were being prepared, Ms. Massey directed that Dean be denied a routine cost of living increase.

158.    On June 15, 2016, Wright pleaded with Massey for Dean's cost of living increase. Wright told Massey that the planned denial of this benefit was unprecedented in the organization.

159.    Massey did not immediately relent, but when attorney/HR representative Keisha intervened, Dean did receive the benefit.

160.    Moreover, Dean had been previously promised a salary adjustment by Massey, as she had accepted a cut in pay to join Chavez Schools.

161.    Massey told Dean that she was not in the budget for the current year since she joined the organization in April, but that in the new fiscal year she would receive her salary adjustment.

162.    However, Dean never received that salary adjustment.

163.    Dean approached Massey again about the salary adjustment after learning that white "favorite" Rob Murphy did receive a salary increase.

164.    At the time of her firing, Dean had still not received her salary adjustment; instead, Massey attempted to deny Dean even a routine cost of living increase.

165.    Dean reported Massey's race discrimination to the Board for herself. Her June 15 letter states:

> I have also been a witness to inappropriate and insensitive comments made by Ms. Massey regarding race, sex and sexual orientation. These comments include commentary on African Americans who attend prestigious colleges and universities only being there through affirmative action programs; African Americans who attend historically Black colleges and Universities having lesser skills and competencies; and calling in my colleague, Mr. Rob Murphy, who is openly gay, to inquire if certain people she has met and expressed interest in are heterosexual or homosexual. For example, she brought Mr. Murphy in and showed him a picture of Jeff Franco of City Year and asked Mr. Murphy, "What is he? Is he straight or gay?" Additionally, during one conversation with Ms. Massey, she informed a group of home office staff members that when she was in college, she slept with her professor to get a good grade. After the class was over, she immediately broke up with him and never returned his calls. All of these examples have made me extremely uncomfortable.

166.    Also on June 15, 2016, Brown provided your client's then-counsel Keisha Jackson with a letter, thanking Jackson for having met with her, and alleging that: - she was promised a salary increase that was never afforded her. It states:

> In my role as the Director of Student Recruitment and Parent Engagement; it is my belief that these concerns are **discriminatory in nature and created a hostile work environment**. By no means is this memorandum intended to be exhaustive. I ask that should you require clarity of any parts or the whole of this document that you do not hesitate to contact me immediately

167.    On June 19, 2016, Chavez demoted Dr. Dean to Senior Director of Accountability.

168.    On Monday, June 20, 2016, Bihr contacted Wright and advised that the Board had shared complaints raised by Wright against Massey, with Massey, and that the Board was confident that Massey herself, could be trusted to address them and would be charged with handling them.

169.    It was only later, after receiving a cautionary email from the Executive Director of HR (Keisha Jackson) not conducting a formal investigation into the matters raised against the CEO, that Bihr indicated that the Board would conduct an investigation.

170.    However, as of that same day, when Wright returned to work, Massey had changed her demeanor toward Wright for the worse.

171.    On June 22, Wright received an email from Massey stating that she and Massey needed an in-person meeting to be held on June 23, 2016. Massey moved Dean and her team, which included Brown, out of the home office location entirely, to a school campus.

172.    Dean informed Chavez Schools that due to her stroke she could not lift heavy objects and needed assistance in moving her items to her new work locations.

173.    However, as of the time of her termination, Dean's items still had not been moved from the home office location to her new work assignment location.

174.    Additionally, only in November 2016— after Massey's departure— did Dean receive workplace accommodations under the Americans With Disabilities Act, such as different lighting due to the permanent damage to her eye sight she suffered as a result of having the stroke.

### Dean Files a Discrimination Charge Against Chavez

175.    On June 19, 2016, Brown and Dean filed discrimination charges with the Equal Employment Opportunity Commission.

### Massey Retaliates Against Wright, by Demoting her

176.    At their June 23, 2016 meeting, Massey ordered Dr. Wright that she was now forbidden from communicating with the Board of Directors.

177.    Massey angrily told Wright that Wright should have told her there were complaints against her, instead of forwarding them to the Board.

178.    Massey added that Wright was henceforth forbidden from initiating nor having any contact with the Board.

179.    Massey ordered that all future communication with the Board was to come through and from Massey alone, and that if there are were any future complaints against her, it was Dr. Wright's responsibility to notify Massey directly.

180.     Wright disagreed with Massey right then on June 23, taking issue with the plan to forbid complaints against Massey from being lodged elsewhere, since no direct report should ever carry the burden of telling their rating supervisor when there is a complaint against them—for risk of retaliation.

181.    Massey responded by presenting an adjusted organizational chart and stating that she would be stripping Wright of 60% of her duties and responsibilities, including reducing the number of employees who would be reporting to Wright, such that the only remaining subordinates were one of the two black women who filed complaints against her (Dean), and the school principals.

182.    Dr. Wright advised Massey that she understood that this was a demotion and retaliation for her sharing the formal complaints with the Board.

183.    Massey responded that she would change it back and proceeded to readjust the organizational chart returning the full population of those managed by Wright to her direct line of oversight.

184.    Dr. Wright was clear on the modus operandi in play by Ms. Massey as she had witnessed these demotions inflicted upon four other women of color including Dean, Brown and Salcido.

185.   After the June 23 meeting, Wright emailed the Board, alleging that Massey was taking retaliatory actions and forbade Wright from talking to any Board members moving forward.

186.   While Massey shifted the organizational chart back, she proceeded to cut Wright out of key meetings and decisions that were central to her position, including replacing Wright as a lead contact person and second in command of the agency (replacing her with a newly-appointed male staff member).

**Chavez Takes Massey's Side in the Dispute**

187.   Throughout summer 2016 and into the current school year, Massey ignored and/or coldly treated all three protesters.

188.   Although Chavez was supposedly undertaking an investigation, and though Chavez had been put on clear notice of the problems again set forth herein, the protesters are aware of no proactive steps actually taken to chasten Massey, improve the work atmosphere, or restore their lost status.

189.   Any internal investigation that may have occurred failed to lead to any tangible improvement in their lot.

**Massey Resigns; Wright Seeks the CEO Post Again, but Upon Directly Hearing her Protected Protest, the Chavez Board Again Rejects her**

190.   On October 1, 2016, Massey advised Dr. Wright that Massey had resigned, apparently of her own volition and not because the instant protests.

191.   Wright specifically "applied" by offering her own name as a candidate for the CEO position.

**Wright Explains Chavez' Hostile Work Environment Again at the October 11 Board Meeting**

192.    Pursuant to Bihr's specific request for a report on the past, on October 11, during the Board meeting, Dr. Wright explained the data and the Massey-led path that had taken Chavez Schools' performance down.

193.    She also shared her sentiments about the racially discriminatory practices of both Massey and the Board.

194.    Thus, Wright repeated the content of some of the problems Massey had caused.

195.    Wright also opined that the Board, including Bihr, had failed to rise to the challenge presented by an ever-growing chorus of employees who had been protesting against hostile, racially discriminatory actions by Massey, and that she believed that the Board had instead allowed Massey's actions to go unchecked.

196.    Wright also referenced the Board's prior 2014 rejection of Wright for promotion to the CEO vacancy, despite its repeated acknowledgment of Wright's value to the organization, and the Board's failure to ever provide any explanation for why Wright was not the right choice in 2014 despite having already been with the organization for 5 years by then.

197.    During and after her presentation, Wright was unfairly attacked by several members of the Board, who were clearly angered by hearing their own actions and those of their hand-picked CEO characterized as discriminatory.

198.    At the conclusion, while there had been no competitive, open, or public process for the prior hiring of Massey, Board members falsely stated that it would now be developing a (fair) process for hiring the next CEO.

199.    On the day of the meeting, Wright finished with her portion of the meeting at approximately 10:30 AM and left.

200. Principals came in immediately thereafter to meet with the Board (for approximately an hour).

201. While the Board asked some questions about how their (the principals') year was going, more questions/comments were directed towards finding support for rejecting Wright's candidacy.

202. For instance, a Board member asked a principal if Wright had put the principals up to writing one of the many letters of support that had been submitted in favor of Wright being named the succeeding CEO.

### TenSquare Personnel are Brought in; Katie Herman Becomes Chavez CEO

203. After the meeting with the principals, TenSquare (the external management company) presented information about its services.

204. At 4:06 pm, Dr. Wright received an email from Bihr asking for the cabinet team to get on a conference call with she and Stinson-Clay at 5:30 that evening.

205. During the subsequent call, Wright and others were advised that the Board was hiring TenSquare and that Katie Herman (who is also white)—a TenSquare principal-- would be the Interim CEO.

206. Upon information and belief, Herman did not subsequently devote her full-time energies to Chavez.

207. Upon information and belief, Herman was paid significantly more than Wright.

### Wright is Again Denied the CEO Position

208. At the meeting, the Board also responded to questions from a principal about why the Board ignored the many letters of support and recommendations of principals to make Dr. Wright the interim CEO, ensuring greater stability for the organization, by stating, "She already has a job..."

209.    By this point, it had become clear that this Board has no intention of ever considering Wright for the role of CEO.

210.    It appeared instead that the Board would instead prefer that Wright continue to work without that formal responsibility, while other white individuals received greater status and recognition.

**Dr. Wright and Dr. Dean Suffer Damage From Being Mistreated**

211.    On October 13, 2016, in response to feeling weak and faint on Wednesday, October 12th, Dr. Wright visited her primary care physician and was notified that her blood pressure was again elevated, and that she needed leave due to work -related stress for the next 6 days.

212.    The physician also referred Wright for consultancy and treatment with a psychologist, given the trauma she had experienced and the impact it was having on her health.

213.    On October 13, 2016, Joan Massey sent a farewell letter to the Chavez Organization (a privilege not granted the Founder of the organization) stating the reason for her departure as, "...given her interest in expansion she is taking on an opportunity with a CMO that is also looking to expand."

214.    On October 16, Dr. Dean sent an email to the established email address for the Board, sharing her apprehension about the transition and its impact on principal retention.

215.    On November 1, the Board responded to Dean's email.

**Wright and Dean Further Protest Discrimination; Wright and Dean are Terminated and Replaced by White Successors who Have no History of EEO Activity Against any of the Defendants**

216.    On November 2, 2016, Dr. Dean met with Interim CEO Katie Herman (from Ten Square), who also brought an HR witness.

217.    Herman, who is white, is one of TenSquare's six "partners".

218.   Dr. Dean asked CEO Katie Herman why HR was present, to which CEO Katie Herman responded, "[b]ecause you sent an email to the Board."

219.   During this meeting, CEO Katie Herman told Dr. Dean she was "difficult", to which Dr. Dean responded that she was aware that this approach and sentiment was a precursor to CEO Herman claiming her as non-essential so she could be RIF'd or terminated.

220.   On November 8, 2016, the undersigned sent a complaint letter to Defendant's counsel, explicitly alleging discrimination and retaliation.

221.   On November 9, Herman provided both Dr. Dean and Dr. Wright, with written notices that they were terminated.

222.   Herman attributed the terminations to an alleged "reduction-in-force."

223.   Upon information and belief, Dean was replaced by Christine Barford who is white, has less experience, and upon information and belief, has no history of EEO activity against any of the Defendants.

224.   Upon information and belief, TenSquare and Chavez personnel, including Katie Herman, jointly made the decision to terminate Dean's employment.

225.   Upon information and belief, TenSquare and Chavez personnel including Katie Herman, jointly made the decision to terminate Wright's employment.

226.   Herman sent both Dean and Wright proposed severance/settlement agreements which she prepared to include her own signature, though they were never executed.

**Chavez' Actions are a Waste of Funds, Undertaken to Satisfy Discriminatory and Retaliatory ends**

227.   Dr. Wright and Dr. Dean possessed significantly greater relevant job knowledge than their TenSquare successors.

228. Chavez's, TenSquare's and Herman's actions reflect an election to spend significantly greater funds on management personnel, than it would have cost to merely retain or promote Wright and to retain Dean.

229. Chavez' and TenSquare's primary purpose seems to have been to discriminate and retaliate against Wright and Dean.

**Chavez Fails Ever to Correct the Hostile Environment or the Retaliation**

230. In response to being notified of Massey's discriminatory and retaliatory actions beginning in June 2016, Chavez should have taken positive action to reverse them, but never did.

## IV.     STATEMENT OF CLAIMS

231. Plaintiff incorporates by reference all of the above-stated paragraphs as if fully stated herein.

**Count I:     2014 Race Discrimination in Promotion, Inflicted Upon Plaintiff Wright, in Violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act, by Defendant Chavez**

232. Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

233. Dr. Wright is an African-American.

234. As shown, in 2014, she was denied selection as CEO, despite being the best qualified candidate.

235. The reasons asserted by Defendants for the non-selection are pretextual and not the real reasons.

236. Defendant Chavez denied Wright selection because of her race.

237. Defendant Chavez's non-selection of Wright for CEO because of her race constitutes unlawful race discrimination in violation of 42 U.S.C. § 1981.

**Count II:**     **Unlawful Racially Hostile Working Environment Imposed Upon Wright, Under 42 U.S.C. § 1981 and the DCHRA, by Defendants Chavez and Massey**

238.     Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

239.     Under the DCHRA and 42 U.S.C. § 1981, it is unlawful for an employer to create a hostile working environment based on race.

240.     Massey harassed Dr. Wright on account of Wright's race.

241.     Massey's actions against Wright constituted a hostile working environment inflicted by Chavez upon Wright, based on Wright's race.

242.     Chavez' Board of Directors was made aware of that Massey's conduct was creating this hostile work environment, by multiple employees.

243.     Chavez failed to act to correct Massey's unlawful behavior against Wright and its effects, either during Massey's employment or after Massey resigned on or around October 1, 2016, up to and including when Wright was terminated, on November 9, 2016.

244.     Chavez and Massey thus created and permitted this hostile working environment based on race, thereby violating 42 U.S.C. §1981 and the DCHRA at D.C. Code § 2-1402.11(a).

245.     To the extent that Chavez or Massey might not be liable directly for the racially hostile work environment imposed against Wright in violation of the statutes, Defendants Chavez and Massey are liable for aiding and abetting in the demotion, under D.C. Code § 2-1402.62. See *Richardson v. Petasis*, 160 F. Supp. 3d 88, 138, 2015 U.S. Dist. LEXIS 163484, *129 (D.D.C. Dec. 7, 2015), citing *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998).

**Count III:        Unlawful Racially Hostile Working Environment Imposed Upon Dean in Violation of Section 1981 and the DCHRA, by Defendants Chavez and Massey**

246.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

247.    Under 42 U.S.C. § 1981 and the DCHRA at D.C. Code 2-1402.11(a), it is unlawful for an employer to create a hostile working environment based on race.

248.    Massey harassed Dr. Dean on account of Dean's race.

249.    Massey's actions against Dean constituted a hostile working environment based on her race.

250.    Chavez' Board of Directors was made aware of that Massey's conduct was creating this hostile working environment, by multiple employees.

251.    Chavez took no action to correct Massey's unlawful behavior against Dean.

252.    Chavez and Massey created and allowed a hostile working environment based on race, and its effects, either during Massey's employment or after Massey resigned on or around October 1, 2016, up to and including when Dean was terminated, on November 9, 2016, thereby violating the DCHRA at D.C. Code § 2-1402.11(a) and 42 U.S.C. § 1981.

253.    To the extent that Chavez or Massey might not be liable directly for the racially hostile work environment imposed upon Dean in violation of the statutes, Defendants Chavez and Massey are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

**Count IV:        Unlawful Retaliatory Hostile Work Environment Imposed Against Wright, by Defendants Chavez and Massey, in Violation of the DCHRA and 42 U.S.C. § 1981**

254.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

255.    Under the DCHRA at D.C. Code § 2-1402.61 and 42 U.S.C. § 1981, it is unlawful for an employer to create a hostile working environment in retaliation for activities protected by the statutes.

256.    Massey harassed Dr. Wright on account of Wright's protected actions undertaken against Massey and Chavez.

257.    Massey's actions against Wright constituted a hostile working environment based on her protected activities.

258.    Chavez' Board of Directors was made aware of that Massey's conduct was creating this hostile working environment, by multiple employees.

259.    Chavez took no action to correct Massey's unlawful behavior against Wright.

260.    Chavez and Massey created and allowed a hostile working environment on account of protected activity, thereby violating the DCHRA and 42 U.S.C. § 1981.

261.    To the extent that Chavez or Massey might not be liable directly for the retaliatory hostile work environment imposed against Wright in violation of the statutes, Defendants Chavez and Massey are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

**Count V:    Unlawful Retaliatory Hostile Work Environment Inflicted Against Dean, by Defendants Chavez and Massey, in Violation of the DCHRA and 42 U.S.C. § 1981**

262.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

263.    Under the DCHRA at D.C. Code § 2-1402.61 and 42 U.S.C. §1981, it is unlawful for an employer to create a hostile working environment in retaliation for activities protected by the statutes.

264. Massey harassed Dr. Dean on account of Dean's protected actions undertaken against Massey and Chavez.

265. Massey's actions against Dr. Dean constituted a hostile working environment based on her protected activities.

266. Chavez' Board of Directors was made aware of that Dean's conduct was creating this hostile working environment, by multiple employees.

267. Chavez took no action to correct Massey's unlawful behavior against Dean.

268. Chavez created and allowed a hostile working environment on account of protected activity, thereby violating the DCHRA and 42 U.S.C. § 1981.

269. To the extent that Chavez or Massey might not be liable directly for the racially hostile work environment imposed against Dean in violation of the statutes, Defendants Chavez and Massey are liable for aiding and abetting in the demotion, under D.C. Code § 2-1402.62.

**Count VI:    Race Discriminatory Demotion of Wright in June 2016, by Defendants Chavez and Massey, in Violation of 42 U.S.C. § 1981**

270. Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

271. As shown in the facts, on June 23, 2016, while Wright was taking issue with the plan to forbid complaints against Massey from being lodged elsewhere, Massey stripped Dr. Wright of 60% of her duties and responsibilities- including reducing the number of employees who would be reporting to Wright-- such that the only remaining subordinates were one of the two black women who filed complaints against her (Dean), and the school principals.

272.  A less qualified staff member who had been with the organization for less than a year, was given some of those duties.

273. The reasons asserted for the demotion are pretextual and not the real reasons.

274.   Defendant Chavez demoted Wright because of her race (and/or her protected activities).

275.   Defendant Chavez and Defendant Massey demoted Wright, or aided and abetted in the demotion, because of her race, thereby violating 42 U.S.C. § 1981 and the DCHRA at D.C. Code § 2-1402.11(a).

276.   To the extent that either might not be liable directly for the Wright demotion under the statute, Defendants Chavez and Massey are liable for aiding and abetting in the demotion, under D.C. Code § 2-1402.62.

**Count VII:   Retaliatory Demotion of Wright in June 2016, by Defendants Chavez and Massey, in Violation of 42 U.S.C. §1981**

277.   Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

278.   As shown in the facts, on June 23, 2016, while Dr. Wright was taking issue with the plan to forbid complaints against Massey from being lodged elsewhere, Massey stripped Wright of 60% of her duties and responsibilities- including reducing the number of employees who would be reporting to Wright-- such that the only remaining subordinates were one of the two black women who filed complaints against her (Dean), and the school principals.

279.    A less qualified, non-protesting staff member who had been with the organization for less than a year, was given some of those duties.

280.   The reasons asserted for the demotion are pretextual and not the real reasons.

281.   Defendant Chavez demoted Wright because of her protected activities, including at least the June 2 meeting at the JW Marriott Hotel, Dr. Wright told Ms. Bihr that Massey was "discriminating against " Brown and Dean.

282.    Defendant Chavez and Defendant Massey demoted Wright, or aided and abetted in the demotion, because of her protected activities (and race), thereby violating 42 U.S.C. §1981.

**Count VIII:    Race-Discriminatory Demotion of Dean by Chavez**

283.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

284.    On or about June 19, 2016, Chavez demoted Dr. Dean to Senior Director of Accountability.

285.    The reasons asserted for the demotion are pretextual and not the real reasons.

286.    Defendant Chavez demoted Dean because of her race (and/or protected activities).

287.    Defendant Chavez and Defendant Massey demoted Dean, because of her race (and/or protected activities), thereby violating 42 U.S.C. §1981.

**Count IX:    Retaliatory Demotion of Dean by Chavez in June 2016**

288.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

289.    During the June 2 meeting at the JW Marriott Hotel, Dr. Wright told Board Chair Bihr that Massey was "discriminating against" Dr. Brown and Dr. Dean.

290.    On or about June 19, 2016, Chavez demoted Dean to Senior Director of Accountability.

291.    The reasons asserted for the demotion are pretextual and not the real reasons.

292.    Defendant Chavez demoted Dean protected activities (and/or her race).

293.    Defendant s' demotion of Dean because of her protected activities and protected activities undertaken in Brown's support, constitutes unlawful retaliation, in violation of 42 U.S.C. §1981.

294.     Defendant Chavez and Defendant Massey demoted Dean, because of her protected activities (and race), thereby violating 42 U.S.C. § 1981

**Count X:     2016 Race-Discriminatory non-Promotion Inflicted Against Plaintiff Wright, by Defendants Chavez, TenSquare and Herman in 2016**

295.     Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

296.     Joan Massey resigned as Chavez CEO on or around October 1, 2016.

297.     Dr. Wright then actively sought the vacated position.

298.     Defendant Chavez entered into a joint employer relationship with TenSquare and its partner, Herman.

299.     Defendant Chavez then again denied Wright the CEO position.

300.     Dr. Wright was the best-qualified candidate.

301.     The reasons asserted by Chavez, TenSquare and Herman for the non-selection are pretextual and not the real reasons.

302.     Defendants Chavez, TenSquare and Herman in fact denied Dr. Wright the position because of her race (and protected activities).

303.     Wright's non-promotion by Defendants Chavez, TenSquare and Herman, because of her race (and prior protected activities), constitutes unlawful race discrimination, in violation of 42 U.S.C. § 1981 and the DCHRA, at D.C. Code § 2-1402.11(a).

304.     To the extent that Chavez, TenSquare or Herman might not be liable directly for the Wright non-promotion under the statute, Defendants Chavez, TenSquare and Herman are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

**Count XI:   2016 Retaliatory non-Promotion Inflicted Against Plaintiff Wright, by Defendants Chavez, TenSquare and Herman, in 2016**

305.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

306.    Joan Massey resigned as Chavez CEO on or around October 1, 2016.

307.    Dr. Wright then actively sought the vacated position.

308.    Defendant Chavez entered into a joint employer relationship with TenSquare and its partner, Herman.

309.    Defendant Chavez then again denied Wright the CEO position.

310.    Dr. Wright was the best-qualified candidate.

311.    The reasons asserted by Chavez, TenSquare and Herman for the non-selection are pretextual and not the real reasons.

312.    Defendants Chavez, TenSquare and Herman in fact denied Dr. Wright the position because of her prior protected activities (and race).

313.    Wright's non-promotion by Defendants Chavez, TenSquare and Herman, because of her race and prior protected activities, constitutes unlawful retaliation, in violation of 42 U.S.C. § 1981 and the DCHRA at D.C. Code §2-1402.61.

314.     To the extent that Chavez, TenSquare or Herman might not be liable directly for the Wright non-promotion under the statute, Defendants Chavez, TenSquare and Herman are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

**Count XII:        Discriminatory Employment Termination, Inflicted Upon Wright in Violation of 42 U.S.C. §1981 and the D.C. Human Rights Act, by Defendants Chavez, TenSquare and Herman**

315.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

316.    At the time of Dr. Wright's and Dr. Dean's terminations, Chavez and TenSquare had become their joint employers.

317.    But for Wright's race (and her protests against Massey, the Board and Chavez, and others' protests on her behalf), Chavez and TenSquare would not have terminated Wright's employment.  The reasons Chavez and TenSquare assert for terminating Wright's employment are not truthful.

318.    Chavez, TenSquare and Herman together terminated Wright because Wright's race in violation of 42 U.S.C. §1981 and the DCHRA.

319.    Chavez's, TenSquare's and Herman's firing of Wright because of her race constitutes unlawful discrimination in violation of the DCHRA at D.C. Code § 2-1402.11(a), and 42 U.S.C. Section 1981.

320.    To the extent that Chavez, TenSquare or Herman might not be liable directly for the Wright firing under the statute, Defendants Chavez, TenSquare and Herman are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

**Count XIII:       Retaliatory Employment Termination, Inflicted Upon Wright in Violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act, by Defendants Chavez, TenSquare and Herman**

321.    Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

322.    Protesting race-based harassment on is a protected activity under 42 U.S.C. § 1981 and the DCHRA.

323.    Dr. Wright engaged in protected activity repeatedly, including in the June 2, 2016 meeting, her June 2016 letter, authorization of a letter from her lawyer to Chavez' counsel on August 1, 2016, her comments directly alleging discrimination during the October 11, 2016 board meeting, and her counsel's November 8 letter alleging discrimination.

324. At the time of Wright's and Dean's terminations, Chavez and TenSquare had become their joint employers.

325. But for Wright's race and her protests against Massey, the Board and Chavez, and others' protests on her behalf, Chavez and TenSquare would not have terminated Wright's employment.

326. The reasons Chavez and TenSquare assert for terminating Wright's employment are not truthful.

327. Chavez, TenSquare and Herman together terminated Wright because Wright engaged in activity protected under 42 U.S.C. §1981 and the DCHRA a D.C. Code §2-1402.61.

328. Chavez's, TenSquare's and Herman's firing of Wright because of her prior protected activity constitutes unlawful retaliation in violation of the DCHRA and 42 U.S.C. Section 1981.

329. To the extent that Chavez, TenSquare or Herman might not be liable directly for the Wright firing under the statute, Defendants Chavez, TenSquare and Herman are liable for aiding and abetting in the demotion, under D.C. Code § 2-1402.62.

**Count XIV:   Discriminatory Employment Termination, Inflicted Upon Dean in Violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act, by Defendants Chavez, TenSquare and Herman, by Discharging Plaintiff Dean**

330. Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

331. At the time of Dr. Wright's and Dr. Dean's terminations, Chavez and TenSquare had become their joint employers.

332. But for Dean's race (and protected activity), Chavez, TenSquare and Herman would not have terminated Dean's employment.

333.     The reasons Chavez, TenSquare and Herman assert for terminating Dean's employment are not truthful.

334.     Chavez, TenSquare and Herman terminated Dean because of her race, in violation of 42 U.S.C. §1981 and the DCHRA at §2-1402.61 (and because of her protected activities).

335.     Chavez's, TenSquare's and Herman's firing of Dean because of her race constitutes unlawful discrimination in violation of the DCHRA and 42 U.S.C. § 1981.

336.     To the extent that Chavez, TenSquare or Herman might not be liable directly for the Dean firing under the statute, Defendants Chavez, TenSquare and Herman are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

**Count XV:  Retaliatory Employment Termination, Inflicted Upon Dean in Violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act, by Defendants Chavez, TenSquare and Herman**

337.     Plaintiffs incorporate by reference all of the above-stated paragraphs as if fully stated herein.

338.     Dr. Dean again undertook protected activity through Wright's speaking on her behalf in the June 2, 2016 meeting, her June 15, 2016 letter, her June 2016 EEOC charge, authorization of a letter from her lawyer to Chavez' counsel on August 1, 2016, and her counsel's November 8 letter alleging discrimination.

339.     In addition, Dr. Wright and Desiree Brown repeatedly referenced the discrimination against Dean in the contexts of their own protected complaints.

340.     At the time of Wright's and Dean's terminations, Chavez and TenSquare had become their joint employers.

341.     But for Dean's protests against Massey (and her race), the Chavez Board and Chavez, and others' protests on her behalf, Chavez, TenSquare and Herman would not have terminated Dean's employment.

342.     The reasons Chavez, TenSquare and Herman assert for terminating Dean's employment are not truthful.

343.     Chavez, TenSquare and Herman terminated Dean because Dean engaged in protected activity and because others supported her with additional protected activities (and because of her race), in violation of 42 U.S.C. § 1981 and the DCHRA at D.C. Code §2-1402.61.

344.     Chavez's, TenSquare's and Herman's firing of Dean because of her protected activity constitutes unlawful retaliation in violation of the DCHRA and 42 U.S.C. § 1981.

345.     To the extent that Chavez, TenSquare or Herman might not be liable directly for the Dean firing under the statute, Defendants Chavez, TenSquare and Herman are liable for aiding and abetting in the demotion, under D.C. Code §2-1402.62.

## V.     REMEDIES

**WHEREFORE**, the Plaintiff prays that the Court grant both Dr. Wright and Dr. Dean. the following relief:

a.     Declaratory judgments that Defendants' conduct violated their rights;

b.     An order from this Court restoring them to their rightful positions at Chavez with full relief, including reinstatement, back pay and benefits;

c.     Compensatory damages against Defendants, for non-pecuniary harm resulting because of Defendants' unlawful actions, in a precise amount to be determined by the jury;

d.     Compensatory damages, for consequential financial harms incurred by Plaintiff because of Defendants' unlawful actions, including but not limited to lost wages and benefits, and future lost wages and benefits;

e.    Punitive damages in an amount to be determined by the jury;

f.    Prejudgment and post-judgment interest;

g.    Reasonable attorneys' fees, expenses and costs, as specifically authorized by statute, to be calculated by the Court pursuant to the established procedures and precedents; and

h.    Such further and other relief as the court shall deem just and proper.

## VI.    DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all issues so triable.


Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC


Leizer Z. Goldsmith    D.C. Bar No. 419544
5335 Wisconsin Avenue, N.W., Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Counsel for Plaintiffs Wright and Dean